[No. G032843. Fourth Dist., Div. Three. Oct. 7, 2003.]

COUNTY OF ORANGE et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
VEDANTA SOCIETY OF SOUTHERN CALIFORNIA et al., Real Parties
in Interest.

**COUNSEL**

Benjamin P. de Mayo, County Counsel, Jack W. Golden, Deputy County Counsel; Law Offices of William D. Ross, William D. Ross and Lisabeth D. Rothman for Petitioners.

No appearance for Respondent.

Connor, Blake & Griffin, Edmond M. Connor and David J. Hesseltine for Real Parties in Interest.

OPINION

**SILLS, P. J.**—We have before us a hard fought writ proceeding over, of all things, the contents of an administrative record in a CEQA case. At the behest of the project opponents, the trial judge excluded items which, as we show below, are required by law to be in that record.

We now grant the petition to require their inclusion. Petitioners have no adequate remedy at law. In CEQA (California Environmental Quality Act) cases time is money. A project opponent can "win" even though it "loses" in an eventual appeal because the sheer extra time required for the unnecessary appeal (with the risk of higher interest rates and other expenses) makes the project less commercially desirable, perhaps even to the point where a developer will abandon it or drastically scale it down.

I

In *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517 [100 Cal.Rptr.2d 889] (*Vedanta I*) this court affirmed a trial court judgment to issue a peremptory writ of mandate to vacate and set aside various land use approvals for a housing development project in Trabuco Canyon. The reason for our decision was that the county board of supervisors had not certified the EIR for the project (originally contemplating 705 units), because the vote on the certification was 2-2, and certification under California's Environmental Quality Act requires a majority of the relevant elected body. (See *id.* at pp. 525–530.)

At that point the board of supervisors and the project developer had two choices if they wanted to proceed with the project. Option one was for the board to simply have voted on the old EIR by a majority vote. Two, they could redo the EIR and submit a new, redone EIR to a vote by the board.

Originally, the board and the developer thought of going with option one. In that regard, an "Addendum No. 2" was prepared for the *old* EIR, with the developer requesting that the board approve a 299-unit project in reliance on that addendum. Option one was rejected, however, with the board of supervisors deciding that a new EIR should be prepared for the 299-unit project. By November 2002 the board had, by majority vote, certified a redone EIR (in the jargon of the case, old FSEIR 566 had now been replaced by new and

improved FRSEIR 566—the key being the "R" for "Revised"), and given various project approvals for a now slightly scaled back 293-unit project. Without going into the details of the pleadings, both old and new, suffice to say that project opponents, led by neighbors and a couple of environmental groups, then brought a CEQA challenge to the new, redone EIR.

The subject of the administrative record concerning the challenge to the new EIR came up at a status conference in late August 2003. Project opponents argued that the administrative record should *not* include either Addendum No. 2, which consists of about 1,100 pages, or 700 additional pages of miscellaneous county documents relating to that addendum. Their theory was that those documents were not before the "county decision-makers" in regard to the new, redone EIR. The trial judge agreed and ruled that the documents were not to be included in the administrative record. The county and the developer then filed this writ proceeding. This court issued a stay of the trial judge's decision and invited an informal response from the project opponents within the week. The 36-page "informal" response that we received would do any lawyer proud even if he or she had several months to prepare it.

II

First, let's go straight to the question of whether the addendum and related county documents are properly part of the administrative record for the new, re-done EIR.

■ The content of administrative records in CEQA proceedings is governed by Public Resources Code section 21167.6.[1] The statute starts off by requiring the plaintiff or petitioner in a CEQA action to affirmatively request that the relevant public agency prepare the administrative "record of proceedings relating to the subject of the action or proceeding." (§ 21167.6, subd. (a).) The next two subdivisions require the public agency to prepare the record within certain time limits (spelled out in subdivision (b) and (c)), and the actual contents are enumerated in subdivision (e).

In this case the project opponents argue that the phrase "record of proceedings relating to the subject of the action or proceeding" in subdivision (a) necessarily *limits* the administrative record in this case to *only* the record

---

[1] All further statutory references are to the Public Resources Code.

of proceedings on the re-done EIR. That argument, however, is not persuasive in light of the actual text of subdivision (e), which contemplates that the administrative record will include pretty much everything that ever came near a proposed development *or* to the agency's compliance with CEQA in responding to that development.

Section 21167.6, subdivision (e) begins with an inclusive view of the record. It states that the record "shall include" a list of 11 different items, but it is "not limited to" them. Among the items that "shall" be included are these:

"(1) All *project* application materials.

"(2) *All* staff reports and related documents prepared by the respondent public agency *with respect to its compliance with the substantive and procedural requirements of this division* and *with respect to the action on the project.* [¶] . . . [¶]

"(6) *All written comments received* in response to, or *in connection with, environmental documents prepared for the project*, including responses to the notice of preparation.

"(7) All written evidence or correspondence submitted to, or transferred from, the respondent public agency with *respect to compliance with this division or with respect to the project.*

"(8) Any proposed decisions or findings submitted to the decisionmaking body of the respondent public agency by its staff, or the project proponent, project opponents, or other persons. [¶] . . . [¶]

"(10) *Any other written materials* relevant to the respondent public agency's *compliance with this division* or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, *and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division.*" (Italics added.)

A

█ A "project" under CEQA is not necessarily coterminous with a particular EIR, though the relevant EIR must obviously review the "defined" project and not some "different" project. (See *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592 [284 Cal.Rptr. 498].) CEQA, however, defines "project" broadly, as an *activity*. Section 21065 says a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change." It does not say that a "project" is every single permutation of a development down to the last shrub or window. Thus courts have opined, based on the breadth of the statutory definition, that a "project" is the "*whole of an action*" which has a potential for resulting in a physical change in the environment, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." (*Burbank-Glendale-Pasadena Airport Authority, supra,* 233 Cal.App.3d at p. 592, italics added.)

Under these definitions, and given the record we have before us in this proceeding, it would be sheer pettifoggery to split the hair's difference between the 299-unit project that was the subject of Addendum No. 2 and related staff reports, and the subsequently approved 293-unit project. Notably, in what is an otherwise very thorough informal response, the project opponents have not argued that the 293-unit project is in any meaningful way different from the previous 299-unit project. (Ironically, to the degree that it is, the deletion of six units probably means it is slightly less environmentally intrusive.) Thus using a "whole of the activity test," or an "overall activity" test, they are substantively the same "project," at least in this case.

That conclusion is also supported by one of the section 21167.6, subdivision (e) categories which was not listed above, which requires the record contain the documentation of the "final" agency decision. Subdivision (e)(9) requires: "The documentation of the final public agency decision, including the *final* environmental impact report, mitigated negative declaration, or negative declaration, and all documents, in addition to those referenced in paragraph (3) above, cited or relied on in the findings or in a statement of overriding considerations adopted pursuant to this division." (Italics added.)
█ The rule against surplusage in statutory construction indicates if a separate category in subdivision (e) focuses on the documentation for the *final* EIR, "project" as it is used in the other categories should naturally be read broadly to include documentation for all *previous* EIR's related to the same general activity contemplated in the "final EIR."

█ One might counter that the "final EIR" referred to in section 21167.6, subdivision (e)(9) is in distinction only to "draft" EIR's about a highly static

"project" and not any previous "final" EIR's that might have been rejected by the agency. However, that reading is in tension with two specific aspects of CEQA. The first is, as discussed above, the broad definition of "project" in section 21065 to mean activity rather than a totally static plan for development. The second is the CEQA process itself, which contemplates revisions, to a greater or lesser degree, in any "project." That is, indeed, one of the major objectives of the CEQA process—to foster better (more environmentally sensitive) projects through revisions which are precipitated by the preparation of EIR's. As *County of Inyo v. City of Los Angeles* (1984) 160 Cal.App.3d 1178, 1185 [207 Cal.Rptr. 425] has stated, CEQA is an "interactive process of assessment of environmental impacts and *responsive project modification* which must be genuine." (Italics added.) It is thus the very nature of CEQA that "projects" will be "modified" to protect the environment, and it is the logic of section 21167.6 that there be a record of such modifications, not just those documents relating only to the finished product.

B

However, even if the word "project" as it runs through section 21167.6, subdivision (e) refers only to material strictly relating to the "final" EIR (as distinct from the basic activity at issue before the lead agency), there is still enough in the statute to make it clear that the Addendum No. 2 here must be part of the administrative record.

Significantly, the statute seeks to include materials not only relating to the "project," but also relating to "compliance" with CEQA. (Indeed, such material is usually listed in juxtaposition to material related to the "project," e.g., "*All* staff reports and related documents prepared by the respondent public agency *with respect to its compliance* with the substantive and procedural requirements" of CEQA "and *with respect to the action on the project.*" (§ 21167.6, subd. (e)(2), *emphasis* added.) Compliance necessarily envisions a review process that transcends the finished "project." If a project has been modified in response to the CEQA process, the logical inference is that the "process works" and the statute is being complied with. To truncate review to just the project as specified in the "final" EIR not only deprives the court of material bearing on changes made by the process itself, but presumptively loads the dice against project proponents who have much more to lose if anything in the record is held inadequate. (See *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 373 [1 Cal.Rptr.3d 726] ["The consequences of providing a record to the courts that does not evidence the agency's compliance with CEQA is severe—reversal of project approval."]) And even material that does not relate to the "final project" per se can, nevertheless, show "compliance" with the CEQA process in getting *to* the final project.

III

■ That leaves us with the procedural argument on which the project opponents base their informal reply—the idea that evidentiary rulings should not be reviewed by writ petition. (See *People v. Municipal Court (Ahnemann)* (1974) 12 Cal.3d 658, 660 [117 Cal.Rptr. 20, 527 P.2d 372]; cf. *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566, fn. 1 [38 Cal.Rptr.2d 139, 888 P.2d 1268].[2]) There are two reasons why the argument fails. First, in substance, a determination of the contents of an administrative record is more a procedural matter than it is an "evidentiary" one. Our Supreme Court has noted that a motion to exclude all evidence as to a particular claim is the functional equivalent of a common law judgment on the pleadings (*Aas v. Superior Court* (2000) 24 Cal.4th 627, 634 [101 Cal.Rptr.2d 718, 12 P.3d 1125]), which is of course reviewable by writ. Here, by a *blanket* exclusion of all material not relating to the "final" EIR, the effect is to render an adverse judgment on whatever claims of compliance with CEQA the county and the developer may be able to make based on that material. This case involves, for example, a whole category of materials generated in connection with the attempt to develop this property in Trabuco Canyon, not just a few discrete documents. Moreover, the compilation of an administrative record, as shown by subdivision (b) and (c) of section 21167.6, is essentially a ministerial task. When the court steps in to exclude material from the agency's own files, the effect is not to make an evidentiary ruling, but one that substantively disposes of the *procedures* under which the court will decide the case.

Second, even if the determination of an administrative record under CEQA is an evidentiary matter, the rule against writ review of evidentiary matters is not absolute. It is framed as what "ordinarily" happens. (*Aas v. Superior Court, supra,* 24 Cal.4th at p. 634 ["a ruling excluding evidence is not ordinarily subject to review by writ"].) In *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1098 [97 Cal.Rptr.2d 382], the court noted that the rule

---

[2] In *Western States* the court *did* address the merits of the petroleum association's attempt to place material that was clearly extrinsic to the record before the court, because the appellate court had done so. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 566, fn. 1.) Other than the fact that both cases involved fights over material to be put before the trial court in CEQA proceedings, *Western States* has no application to the case at hand. There the petroleum association challenged *regulations* of the Air Resources Board, and sought admission of extra-record evidence related to the *scientific* bases of those regulations. The Board was thus acting in a quasi-legislative capacity, as distinct from the case before us, where the relevant agency acted in a quasi-judicial one. (See *id.* at pp. 566–567.) There was no issue of determining what was appropriate for the administrative record and what was not. For example, there was no argument that the extra-record material should have been included in it because it was generated in the process of formulating the regulations.

would not apply " ' "when the remedy by appeal is rendered inadequate in the context of a specific case." ' " (Quoting *Silva v. Superior Court* (1993) 14 Cal.App.4th 562, 573–574 [17 Cal.Rptr.2d 577], quoting *California Trial Lawyers Assn. v. Superior Court* (1986) 187 Cal.App.3d 575, 579 [231 Cal.Rptr. 725].) A classic example when the rule does not apply is a pretrial matter involving the attorney-client privilege. (See *Glade v. Superior Court* (1978) 76 Cal.App.3d 738, 742 [143 Cal.Rptr. 119].)

■ The Legislature has provided for expedited review of CEQA cases. (See Ferester, *Revitalizing the National Environmental Policy Act: Substantive Law Adaptations from NEPA's Progeny* (1992) 16 Harv. Env. L.Rev. 207, 235 [noting that the "timing provisions" of CEQA "embody a clear legislative imperative to hasten the judicial review process in order to prevent expensive and wasteful delays"].) The statute of limitations to challenge an EIR is only 30 days. (§ 21167, subd. (c)). Cases are entitled to preferential hearings so that they may be "quickly heard and determined in the lower courts" (§ 21167.1, subd. (b)) and expedited briefing schedules (§ 21167.4, subd. (c)). Indeed, the time limits for compilation of the administrative record in subdivision (b) and (c) of section 21167.6 are a manifestation of the same focus on the value of time.

In fact, the Legislature has recognized that, particularly in the CEQA context, time is money. The name of the game may be, from the project opponent's point of view, to spot the inadequacy in the EIR, but the game itself must be played quickly.

Let us assume, in the case before us, that exclusion of Addendum No. 2 and related county file materials is an error that must be corrected by way of the remedy of appeal. That doesn't necessarily mean the appeal will be an adequate remedy. To build guaranteed delay into the process is to guarantee that the project opponents will prevail to the extent of delaying the project, which itself must necessarily be one of their goals. The Legislature has obviously structured the *legal process* for a CEQA challenge to be speedy, so as to prevent it from degenerating into a guerilla war of attrition by which project opponents wear out project proponents. Thus, if an adequate record is the reason, even a proverbial "slam dunk reversal" of a decision favoring the project opponents would be a tactical win for those opponents, who would have succeeded in building into the process the *unnecessary extra delay* that would accrue from having the case sent back for reevaluation in the light of the excluded materials.

Realistically, we expect an appeal from whatever decision the trial court makes. (Perhaps we will be surprised and the parties will settle, but from our perspective here, that seems unlikely.) *That* appeal is part of the rules of the

game.  ▉  But it is not within the rules to build into the legal process the probability of *two* appeals—one from a decision without the excluded materials, and one from the decision after the first one is ostensibly corrected.

## IV

The project opponents' other arguments—essentially that the trial judge "used the appropriate burden of proof" and did not violate the project proponents' procedural rights by allowing them to make arguments in an ex parte hearing as to why they might need the excluded materials—are derivative. They depend on the validity of the determinations that (a) the materials are not properly part of the appellate record, or (b) that any error in regard to (a) cannot be corrected here.

▉  There is an irony in these arguments that must be noted. Essentially, they make the point that the project proponents are not *prejudiced* by the trial court's ruling. But when it comes to the administrative record in a CEQA case, any reduction in its contents is *presumptively* prejudicial to project proponents. (See *Protect Our Water, supra,* 110 Cal.App.4th at p. 373 [noting severity of consequence to project proponents if inadequate record is not provided to the court].) It is, after all, the project proponents who will be saddled with the task of pointing to things in the record to refute asserted inadequacies in the EIR. By all rights, then, the burden of showing prejudice from any overinclusion of materials into the administrative record must be on the project opponents, who have the most to gain from any underinclusion. (Cf. *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 447–448 [243 Cal.Rptr. 727] [complaint of higher than necessary changes for organizing and indexing of record]; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 180–181 [43 Cal.Rptr.2d 501] [same].)

Given the time value which the Legislature has put on CEQA cases, there is no reason to delay proceedings further. Under the circumstances of this case, a peremptory writ in the first instance, as requested in the petition, is appropriate. (See *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180 [203 Cal.Rptr. 626, 681 P.2d 893].) The "informal" response certainly "adequately address[es] the issues raised by the petition," no factual dispute exists, and additional briefing and argument would only further delay a process that is supposed to be expedited. (See *id.* at p. 178.)

Let a peremptory writ issue commanding the superior court to include Addendum No. 2 and the related county materials in the administrative record. The matter of costs in this writ proceeding is reserved for the trial court in the first instance.

Rylaarsdam, J., and Bedsworth, J., concurred.